**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

**NEVILLE EWELL II and DONTA DAVIS,**

**Plaintiffs,**

**v.** **Case No. 25-CV-293-GLJ**

**OKMULGEE COUNTY CRIMINAL JUSTICE AUTHORITY, et al.,**

**Defendants.**

**OPINION AND ORDER**

This matter comes before the Court on Defendant Lino Davis's ("Defendant Davis") Motion for Summary Judgment. Docket No. 38. Plaintiffs Neville Ewell II ("Ewell") and Donta Davis ("Detainee Davis") each allege a claim of excessive force against Defendant Davis, in his individual capacity. Docket No. 2. For the reasons set forth below, Defendant Davis's Motion for Summary Judgment [Docket No. 38] is DENIED.

**PROCEDURAL HISTORY**

Ewell and Detainee Davis filed their Complaint on August 19, 2025, asserting an individual capacity claim against Defendant Davis for excessive force. Docket No. 2 at 8-9.[1] Ewell and Detainee Davis also assert a municipal liability claim against Defendant Okmulgee County Criminal Justice Authority ("OCCJA"). *Id.* at 9-10.[2] Defendant Davis filed his Motion for Summary Judgment [Docket No. 38] on July 29, 2026, and it is now ripe. *See* Docket Nos. 38, 49, 52. Defendant Davis contends his use of force against Ewell was applied in a good faith effort

---

1 The Court's citations refer to the CM/ECF header pagination.

2 Ewell and Detainee Davis originally asserted a supervisory liability claim against Defendant Shannon Clark. Docket No. 2 at 10-11. However, on August 31, 2026, Ewell, Detainee Davis and Shannon Clark filed a Joint Stipulation of Dismissal with Prejudice as to Defendant Shannon Clark. Docket No. 51.

to maintain or restore discipline and, therefore, was constitutional. *See* Docket No. 38 at 12-15. Defendant Davis contends his use of force against Detainee Davis was objectively reasonable and likewise constitutional. *See id.* at 15-18. Defendant Davis also contends he is entitled to qualified immunity as it relates to both plaintiffs' claims. *See id.* at 18-20.

**SUMMARY JUDGMENT STANDARD**

Summary judgment should be granted if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has the burden of showing the absence of a genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and the evidence is to be taken in the light most favorable to the non-moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A party "asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute[.]" Fed. R. Civ. P. 56(c). Indeed, "[i]f the movant carries this initial burden, the non-movant may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Kaul v. Stephen*, 83 F.3d 1208, 1212 (10th Cir. 1996) (*quoting Wolf v. Prudential Ins. Co. of America*, 50 F.3d 793, 796 (10th Cir. 1995)). The Supreme Court of the United States ("Supreme Court") has stated that the "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## FACTUAL BACKGROUND

The following undisputed facts are gleaned from the record. On April 12, 2021, a "riot-like disturbance" broke out among the forty-seven (47) individuals housed in the X-Pod of OCCJA's Moore Detention Center. *See* Docket Nos. 38-4, 38-5, 38-6, 38-7, 38-8, 38-11, 38-12, 38-13, 42-1, 42-6, 42-15. The X-Pod housed mainly federal inmates. Docket No. 38-3 at 4. Detainee Davis and Ewell were both housed in the X-Pod at the time. *See* Docket No. 49-3 at 2-3; *see also* Docket No. 49-4 at 1. Detainee Davis was a pretrial detainee awaiting a new trial after his first conviction was vacated due to *McGirt v. Oklahoma*, 591 U.S. 894 (2020). Docket No. 38-2. Ewell was a convicted federal prisoner. Docket No. 38-1.

On the evening of April 12, 2021, around 8:00 p.m., inmates in the X-Pod were observed fighting, drinking contraband alcohol and fashioning weapons out of brooms and mops. *See* Docket No. 38-12. In response to the disturbance, the Corrections Emergency Response Team ("CERT Team"), a specialized unit within the OCCJA, was activated to gain control of the situation. *Id.*; Docket No. 38-11 at 1. Defendant Davis responded to the Moore Detention Center as part of CERT Team. Docket No. 38-11. Defendant Davis was armed with a "less lethal" shotgun, beanbag rounds, and rubber pellet rounds. *Id.* at 2; *see also* Docket No. 49-2 at 13. Around 10:30 p.m., the CERT Team, along with officers from the Okmulgee County Sheriff's Office, entered the X-Pod. *See* Docket No. 42-17; *see also* Docket Nos. 38-4; 38-7. These officers were initially greeted with chunks of cement, food trays and broken broom/ mop handles being thrown at them. *See* Docket Nos. 38-11 at 2; 38-12 at 1; 38-13 at 1. In response, the officers deployed rubber pellets, beanbags, pepper balls and CS gas to ultimately bring the inmates into compliance. Docket Nos. 38-6; 38-8; 38-12. Once the officers gained control of the X-Pod, the inmates were handcuffed and removed, one at a time, to the recreation yard ("rec yard"). Docket

Nos. 38-6; 38-8; 38-12. Detainee Davis and Ewell were ultimately seated next to each other near a corner. *See* Docket No. 42-17 at 22:34:39.

After the inmates were in the rec yard, Defendant Davis returned to the rec yard and fired a warning shot into the air. Docket No. 42-17 at 22:34:18; Docket No. 38-3 at 5-6, 26. The inmates were then ordered to lay down on their stomachs. Docket No. 38-3 at 5. Shortly after, Defendant Davis is seen on video footage walking in the rec yard. *See* Docket No. 42-17 at 22:34:39. He then lifts his shotgun, aims and fires it while walking towards Detainee Davis and Ewell. *See id.* at 22:34:39-22:34:43. Ultimately, Detainee Davis was struck once by Defendant Davis's rubber pellets, and Ewell was struck multiple times by Defendant Davis's rubber pellets. *See* Docket Nos. 42-20 through 42-23.

Defendant Davis completed a report after the disturbance which did not contain any reference to the deployment of nonlethal force in the rec yard. *See* Docket No. 42-26. He ultimately amended his report to note,

> As Inmates in the far corner refused further commands and I notice a group of Inmates appeared to be instigating other Inmates to refuse orders. Inmate who was later identified as Davis, Donta Keith DOB: [redacted] appeared to bring his knee up to his chest instead of laying on the ground another round was deployed hitting him in the stomach.

Docket No. 38-11 at 3. The OCCJA conducted an internal investigation and terminated Defendant Davis based on his deployment of less lethal projectiles in the rec yard. *See* Docket No. 42-19. Defendant Davis's termination letter noted,

> In regards to the Incident of April 12, 2021, you reported that you deployed a "less lethal" projectile into Donta Keith Davis for instigating others to refuse orders, and attempting to bring his knee to his chest instead of laying on his stomach. You also

> fired a warning shot upon entry to the recreation yard, sending an uncontrolled projectile into airspace, in contravention to training and law enforcement practices.
>
> Video of the Incident, and medical checks, reflect the individual struck by the projectile was Neville Ewell. Further review of the incident showed that Sergeant Bartolo Estrada and Captain Victor Gomez were within your field of fire.
>
> Your use of force was inappropriate and unsafe.

*Id*. Detainee Davis and Ewell's suit followed the April 12, 2021 incident. Docket No. 2.

## ANALYSIS

### I. Qualified Immunity

Defendant Davis contends he is entitled to qualified immunity as it relates to both Detainee Davis and Ewell's claims. Docket No. 38 at 18-20. "Qualified immunity protects government officials from civil liability so long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Arnold v. City of Olathe, Ks.*, 35 F.4th 778, 788 (10th Cir. 2022) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, (2009)). "The doctrine protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In resolving questions of § 1983 qualified immunity at the summary judgment stage, courts engage in a two-pronged inquiry. *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). The first prong "asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right." *Id.* at 655-56 (citation, alterations, and internal quotation marks omitted); *see York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008). The second prong asks "whether the [federal] right in question was 'clearly established' at the time of the violation." *Tolan*, 572 U.S. at 656 (citation omitted). Once a defendant asserts qualified immunity, the plaintiff has the burden of demonstrating both that the defendant violated the plaintiff's constitutional right and that the constitutional rights were "clearly established" at the

time of defendant's action. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011).

"[F]or a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013) (internal quotation marks and citation omitted). To show that the constitutional right was "clearly established" at the time the defendant acted, the Court does "not require a case directly on point." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). Even though there need not be a "case directly on point," courts are "not to define clearly established law at a high level of generality" and "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 741, 742 (citations omitted) (emphasis added). The right must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alterations omitted).

**A. Violation of Detainee Davis's Fourteenth Amendment Right**

As mentioned, Detainee Davis asserts an excessive force claim against Defendant Davis in his individual capacity. Docket No. 2 at 8-9. Detainee Davis concedes, as a pretrial detainee, this claim is governed by the Fourteenth Amendment. Docket No. 49 at 22.[3] For excessive force claims brought pursuant to the Fourteenth Amendment, the Supreme Court instructs that this is a purely objective standard such that "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S.

---

[3] "Excessive force claims can be maintained under the Fourth, Fifth, Eighth, or Fourteenth Amendment—all depending on where the [plaintiff] finds himself in the criminal justice system—and each carries with it a very different legal test." *Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010). It is "well-established that the Fourteenth Amendment governs any claim of excessive force brought by a pretrial detainee." *Estate of Booker v. Gomez*, 745 F. 3d 405, 419 (10th Cir. 2014).

389, 396-397 (2015); *see also id.* at 397 ("[T]he appropriate standard for a pretrial detainee's excessive force claim is solely an objective one."). Of course, this "turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

> A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. A court must also account for the "the legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security."

*Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)). The *Kinglsey* Court outlined the following factors to determine "the reasonableness or unreasonableness of the force used[:]"

> These considerations include "[1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting."

*Wise v. Caffey*, 72 F.4th 1199, 1206 (10th Cir. 2023) (quoting *Kingsley*, 576 U.S. at 397). This is not an exclusive list but is illustrative of "the types of objective circumstances potentially relevant to a determination of excessive force." *Kingsley*, 576 U.S. at 397.

**1. The Parties' Positions**

Defendant Davis contends summary judgment in his favor is appropriate because his conduct was objectively reasonable from his perspective. *See* Docket No. 38 at 17-18. Defendant Davis relies on the following facts: the incident in the rec yard occurred shortly after a violent disturbance in X-Pod [*see* Docket No. 38-9]; Defendant Davis was informed the inmates had not been searched prior to being removed from the X-Pod to the rec yard [Docket No. 38-3 at 10, 14]; Defendant Davis entered the rec yard because the inmates were "becoming aggressive towards officers again," and inmates were continuing to yell and threaten officers and defying commands

[Docket No. 38-11 at 2 and Docket No. 38-3 at 3, 5-6]; and as Captain Gomez turned his back on Detainee Davis, Defendant Davis observed Detainee Davis move his leg in a way that Defendant Davis, based on his experience, believed to indicate Detainee Davis, who was double-cuffed and had an increased range of motion, was attempting to stand up [Docket No. 38-3 at 9-10, 12]. Defendant Davis takes the position that "[h]e again ordered [Detainee] Davis to lay on his stomach, and when he did not comply, [Defendant] Davis deployed his less lethal device." Docket No. 38 at 17.

In contrast, Detainee Davis, relying on the *Kingsley* factors, argues, first, there was no security problem in the rec yard as all the inmates were handcuffed and secured in the rec yard. Docket No. 49 at 23; *see also* Docket No. 42-17 and Docket No. 49-1 at 5. Second, given Detainee Davis's location, handcuffed on the ground, there was "no threat to perceive." Docket No. 49 at 23; *see also* Docket No. 38-13. Third, Detainee Davis was not resisting. Docket No. 49 at 23. Instead, he was complying with another officer's directive to scoot over. Docket No. 49-4 at 2-3. Fourth, Defendant Davis made no effort to temper the force, and Detainee Davis had no opportunity to comply. Docket No. 49 at 23. Detainee Davis points to evidence that indicates Defendant Davis's command for Detainee Davis to lay on his stomach and Defendant Davis's shot occurred within one second. *See* Docket No. 49-1 at 25; *see also* Docket No. 49-2 at 17. Further, Defendant Davis did not warn Detainee Davis he would be shot nor did Defendant Davis attempt to utilize any lesser force. Docket Nos. 49-4 at 3; 49-2 at 27-28. Fifth, concerning the proportionality of the force used, Detainee Davis contends, "a 12-guage shotgun fired from approximately one foot into a restrained, prone man is not a measured response to a knee movement made at an officer's direction." Docket No. 49 at 23. Sixth, Detainee Davis contends he was injured from Defendant Davis's use of force. *Id.* at 23-24. Detainee Davis states he suffered

a visible and painful contusion, scarring, physical pain, embarrassment and mental distress. *Id.*; *see also* Docket No. 49-4 at 4.

**2. The Court's Analysis**

The Court has reviewed the record submitted. Viewing the facts in the light most favorable to Detainee Davis [*Tolan*, 572 U.S. at 655], the Court gleans the following: there was a disturbance in X-Pod the evening of April 12, 2021. *See* Docket No. 42-10. Detainee Davis can be seen standing next to a bunk and walking near the bathroom while other inmates and detainees wield their makeshift weapons. *See, e.g.* Docket No. 42-10 at 21:54:14-22:02:15. Around 22:02:09, Detainee Davis enters the shower area, and he does not exit until after officers enter X-Pod. *See id.* at 22:02:15-22:17:03. Based upon the Court's review, Detainee Davis did not employ a weapon, throw any items or otherwise engage with the disturbance.[4] Detainee Davis exited the pod, by crawling on his hands and knees, at approximately 22:17:56. *Id.* at 22:17:54-22:17:57.

Detainee Davis is first seen on the rec yard video at 22:20:42. Docket No. 42-17 at 22:20:42.[5] He is escorted by an officer, his hands are cuffed,[6] and he is placed seated against a wall near the corner. *See id.* at 22:20:42-22:20:55. Detainee Davis does not leave his seated position against the wall as other inmates are brought into the rec yard. *See id.* at 22:20:55-22:34:19. Other inmates can be seen walking around and engaging with each other during this time. *See id.*

[4] The Court finds Detainee Davis's conduct in the pod is relevant because Defendant Davis reported the officers "reviewed live footage of inside the pod" before entering the X-Pod. Docket No. 38-11 at 2.

[5] The rec yard video does not have any audio. *See* Docket No. 38-3 at 2.

[6] In contrast to Defendant Davis's testimony, Detainee Davis's wrists do not appear to be double cuffed. *See* Docket No. 42-17 at 22:20:45.

At 22:34:18, an object can be seen flying across the rec yard. Docket No. 42-17 at 22:34:17-22:34:19. Defendant Davis acknowledged this was the "warning shot" he fired into the air to gain compliance. Docket No. 38-3 at 5-6. At the time the warning shot is fired, the inmates that can be seen in the video are seated, except for one individual at the bottom of the screen who appears to be standing. *See* Docket No. 42-17 at 22:34:17-22:34:18. All of the inmates and detainees appear to be handcuffed. *See id.* There is not an abundance of physical movement which would indicate the disturbance was resuming. *See id.* at 22:34:00-22:34:18. Approximately one minute before Defendant Davis's entrance into the rec yard and firing of the warning shot, unarmed officers can be seen walking among the seated inmates. *See, e.g.,* Docket No. 42-17 at 22:33:29-22:33:36.

After the warning shot is fired, the inmates begin moving towards their stomachs, consistent with Defendant Davis's testimony that he instructed the inmates to "roll over, get on your stomachs, and lay flat." Docket No. 42-17 at 22:34:18-22:34:25; *see also* Docket No. 38-3 at 5. Additionally, at this point, several officers enter the rec yard; some are armed and some are not. *See* Docket No. 42-17 at 22:34:18-22:34:32. Detainee Davis can be seen moving towards his side at 22:34:30. *Id.* at 22:34:25-22:34:32. He is in close quarters to two others on each of his sides, and Sergeant Estrada can be seen walking very close to him and assisting the inmate immediately next to Detainee Davis. *See id.* at 22:34:30-22:34:36. As Detainee Davis is on his side without much spare room on either side of him, it appears Seargent Estrada provides an instruction, as he is bent over towards Detainee Davis and the inmate behind him. *See id.* at 22:34:34-22:34:37; *see also* Docket No. 49-4 at 3 (Detainee Davis declared "the officer standing near me told me to move over[.]"). Detainee Davis and the two inmates on either side of him begin to shift. Docket No. 42-17 at 22:34:36-22:34:40. Captain Gomez walks past Detainee Davis and

continues walking, turning his back on Detainee Davis, indicating there was no issue in Detainee Davis's corner. *See id.* at 22:34:34-22:34:42. Additionally, Sergeant Estrada, who was one inmate over from Detainee Davis, is actively bent over aiding Detainee Davis's neighbor in moving to his stomach. *See id.* at 22:34:39-22:34:43.

Defendant Davis is first seen in clear view on the video at 22:34:38 carrying his "less lethal shotgun" loaded with bean bags and rubber pellets. Docket No. 42-17 at 22:34:38; *see also* Docket No. 49-2 at 13. Defendant Davis faces Detainee Davis's direction at approximately 22:34:40. Docket No. 42-17 at 22:34:40. Defendant Davis takes a step towards Detainee Davis's vicinity at 22:34:41 and fires his weapon in the same moment. *Id.* at 22:34:40-22:34:41. Then, with his weapon raised, he walks towards Detainee Davis while continuing to fire. *Id.* at 22:34:40-22:34:44. Below are screen captures from the moments leading up to and involving the shooting from the rec yard video [Docket No. 42-17]:


22:34:39
Sergeant Estrada
Detainee Davis
Ewell
Captain Gomez
Defendant Davis


22:34:40


22:34:41


22:34:42


22:34:43




Docket No. 42-17; *see also* Docket Nos. 38 at 11; 38-3 at 7.

Per Defendant Davis's testimony, Detainee Davis's bent knee at 22:34:39-22:34:40 was the perceived threat. *See* Docket Nos. 38-11 at 3; 38-3 at 9-10.

The Court now turns to the *Kinglsey* factors. A portion of the first,[7] the second,[8] and the third[9] factors are undisputed. First, Defendant Davis characterized his weapon as "less lethal" [Docket No. 49-2 at 26], and Shannon Clark, Executive Director of OCCJA, testified if "less lethal" weapons are used in the wrong way, they have the potential to be lethal. Docket No. 49-5 at 9. The force was used within close range and was known to spray. Docket No. 49-2 at 11; *see also* Docket No. 42-17 at 22:34:39-22:34:44. Therefore, the Court considers the amount of force used to be significant. Second, Defendant Davis does not dispute Detainee Davis's injuries. *See* Docket No. 38 at 17-18. Finally, Defendant Davis concedes he did not attempt to temper or limit the amount of force used. Docket No. 49-2 at 27-28.

However, concerning the remaining factors, there is sufficient evidence favoring Detainee Davis for a jury to conclude Defendant Davis's use of force was objectively unreasonable. *See Anderson*, 477 U.S. at 249. Beginning with the severity of the security problem at issue, a reasonable factfinder viewing the rec yard video could conclude there was no ongoing threat as evidenced by unarmed officers in close vicinity to Detainee Davis, the inmates were all handcuffed and most visible inmates were complying with the instruction to roll to their stomachs. Concerning the reasonably perceived threat by Defendant Davis and whether Detainee Davis was resisting, a reasonable factfinder could conclude Detainee Davis was not attempting to stand but instead was complying with Sergeant Estrada's command to scoot over. Finally, a reasonable factfinder could

---

[7] The amount of force used. *Kingsley*, 576 U.S. at 397.

[8] The extent of the plaintiff's injury. *Kingsley*, 576 U.S. at 397.

[9] Any effort made by the officer to temper or to limit the amount of force. *Kingsley*, 576 U.S. at 397.

conclude the deployment of rubber pellets in close range to Detainee Davis was unnecessary compared to Detainee Davis's observable compliance and lack of any ongoing security threat.

In all, the Court concludes a reasonable factfinder could conclude Defendant Davis's use of force was objectively unreasonable under the circumstances and, therefore, summary judgment is inappropriate.

**B. Clearly Established Law**

Detainee Davis argues his "right to be free from force while subdued and compliant was clearly established." Docket No. 49 at 24. The Court agrees. In *Estate of Booker v. Gomez*, the plaintiff, a pretrial detainee, asserted that defendants used excessive force in subduing him after he physically resisted going into a holding cell during booking. *Estate of Booker*, 745 F.3d at 412-413. Booker died after defendants put "substantial pressure on his back," Tasered him, and put him in a "carotid neckhold," even though Booker was handcuffed and "did not resist during the vast majority of the encounter." *Id.* at 413-414, 424. In determining that defendants were not entitled to qualified immunity, the Tenth Circuit announced that *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008) (it was "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force."), *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007) ("it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance."), and the weight of authority from other jurisdictions "put Defendants on notice that use of such force on a person who is not resisting and who is restrained in handcuffs is disproportionate." *Id.* at 428-29.

Furthermore, the Tenth Circuit has "made clear that using less lethal weapons . . . on subjects who do not pose an immediate threat to officers can constitute excessive force." *Chapman*

*v. Hedderman*, 2021 WL 2149322, at *5 (W.D. Okla. May 26, 2021) (unpublished).[10] In *Chapman*, the defendant deployed a pepper-gel gun into the pretrial detainee plaintiff's face at close range while she was located in a jail cell. *Id.* Relying on *Buck v. City of Albuquerque*, 549 F.3d 1269 (10th Cir. 2008),[11] and *Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008),[12] the district court concluded, "these cases make the contours of the right involved – to be free from a violent use of force where the plaintiff is restrained, secured, or not posing an immediate risk – sufficiently clear." *Id.* at 6.

In sum, construing the facts in Detainee Davis's favor, the Court concludes that Defendant Davis was on notice that deploying non-lethal projectiles at close range against a pretrial detainee who is handcuffed and does not pose an immediate threat is a violation of clearly established law. *See, e.g., McCowan v. Morales*, 945 F.3d 1276, 1287, 1286-1289 (10th Cir. 2019) (Despite a lack of a "factually identical prior case," finding it clearly established by 2011 that "gratuitous application of force to [] a fully subdued, compliant and non-threatening misdemeanant arrestee [] violated the Fourth Amendment."). Therefore, Defendant Davis's Motion for Summary Judgment as to Detainee Davis is denied, and he is not entitled to qualified immunity.

---

[10] The Court cites all unpublished decisions herein as persuasive authority. FED. R. APP. P. 32.1(a); 10th Cir. R. 32.1(A).

[11] *Buck*, 549 F.3d at 1291 (deployment of tear gas, pepper spray and non-lethal projectiles on protesters was an unreasonable use of force where "not one of the suspected crimes charged or uncharged was severe, neither posed a threat to the safety of an officer or others, and neither attempted to flee or evade arrest.")

[12] *Fogarty*, 523 F.3d at 1160-62 (denying qualified immunity to the defendant officers after finding that hitting a protestor with a less lethal projectile was an excessive use of force where the protestor was unarmed, did not attempt to evade arrest, and "presented no immediate threat to anyone's physical safety.").

**C. Violation of Ewell's Eighth Amendment Right**

Ewell also asserts an excessive force claim against Defendant Davis. Docket No. 2 at 8-9. Both parties agree that because Ewell was a convicted prisoner on April 12, 2021, his claim is evaluated under the Eighth Amendment. Docket No. 38 at 12; Docket No. 49 at 15. An Eighth Amendment excessive force claim ordinarily "involves two prongs: (1) an objective prong that asks if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and (2) a subjective prong under which the plaintiff must show that the officials acted with a sufficiently culpable state of mind." *Graham v. Sheriff of Logan Cnty*., 741 F.3d 1118, 1123 (10th Cir. 2013) (quoting *Giron v. Corrs. Corp. of Am.*, 191 F.3d 1281, 1290 (10th Cir. 1999)).

As for the subjective prong, it "turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Smith v. Cochran*, 339 F.3d 1205, 1212 (10th Cir. 2003) (internal quotations and citations omitted); *see also Hudson v. McMillian*, 503 U.S. 1, 6 (1992). To determine whether a prison official acted maliciously and sadistically, a court should consider: "(1) the need for force, (2) the amount of force used, (3) the threat perceived by officials, and (4) efforts to temper the amount of force used." *Leggett v. Clark*, 39 F.3d 1192 (Table), 1994 WL 589445, at *3 (10th Cir. 1994) (citing *Hudson*, 503 U.S. at 7).

The objective prong does not require the prisoner to show a "significant injury[.]" *Graham*, 741 F. 3d at 1123. Instead, the inquiry centers on the "nature of the force" used. *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010). Although the extent of the injury suffered may be instructive in determining the amount of force used, a minor injury can still support an Eighth Amendment claim if the force used was "nontrivial and was applied maliciously and sadistically to cause harm." *Id.*

**1. The Parties' Positions**

Defendant Davis contends he "did not maliciously and sadistically strike Ewell with rubber pellets. Instead, he deployed the rubber pellets at Inmate Donta Davis, who he perceived was disobeying orders during an attempt to quell an ongoing riot among the inmates." Docket No. 38 at 15. "Unfortunately, Ewell, who happened to be lying on the ground next to Inmate Donta Davis, was also accidentally struck by the rubber pellets." *Id.* Defendant Davis categorizes the force used as "reasonable force in a good faith effort to maintain or restore discipline." *Id.* Defendant Davis does not thoroughly analyze the *Hudson* factors. *See* Docket No. 38 at 13-15.

In contrast, Ewell argues there was not any need for force and, therefore, the subjective prong is established. *See* Docket No. 49 at 16-20. Further, Ewell was not struck by "accident" offering a viable excuse for Defendant Davis's use of force. *See id*. Ewell also argues the *Hudson* factors lead to the conclusion that Defendant Davis's use of force against Ewell was a violation of the Eighth Amendment. *Id.* at 16-18.

**2. The Court's Analysis**

The Court, using the *Hudson* factors, considers whether Defendant Davis acted with a sufficiently culpable state of mind.[13] As noted above with respect to Detainee Davis, it is undisputed Defendant Davis did not make any effort to temper the amount of force used. Docket No. 49-2 at 27-28. Additionally, it is undisputed the amount of force used was significant. The force utilized was known to spray and was deployed in close range. Docket No. 49-2 at 11; *see also* Docket No. 42-17 at 22:34:39-22:34:44. Further, Ewell, whom Defendant Davis admitted "was not my intended target at all," was struck multiple times. Docket Nos. 38-3 at 18; 42-22; 42-

[13] Defendant Davis did not challenge the objective prong. *See* Docket No. 38 at 12-15; *see also* Docket No. 49 at 15, n.1. Accordingly, the Court considers this prong undisputed.

23. While Detaine Davis, the intended target, was struck once. Docket Nos. 38-3 at 16; 42-20; 42-21.

Regarding the remaining two *Hudson* factors, the Court already concluded the need for force and the threat perceived by Defendant Davis are disputed genuine issues of material facts. *See supra*. Critically, in factually similar cases, there is typically *appropriate* force directed at one inmate to restore or maintain order and the plaintiff is merely an unintended recipient of the force. For example, in *Redmond v. Crowther*, 882 F.3d 927 (10th Cir. 2018), one prisoner, James Hill, disobeyed officers' orders, "walked into [the] recreation yard and closed the door behind him, which caused it to lock. Hill then took off his glasses and began sharpening them on the wall. He declared he would 'stick or cut the first pig that came out there,' paced aggressively, swung his arms in the air, swore, and spit at prison officials." *Id.* at 934. In response, Nicholes, a member of the prison's special operations unit, deployed CS gas. *Id.* When the CS gas was deployed, it was drawn into the HVAC unit's intake vent and pumped into the prison. *Id.* As a result, plaintiff Redmond was exposed to CS gas. *See id.*

Redmond initiated an Eighth Amendment claim. Applying the Eighth Amendment's excessive force framework, the Tenth Circuit concluded, "Redmond fails to meet his burden of proving Nicholes . . . acted with the subjective intent required to use excessive force. The record reveals the defendant[] inadvertently – not intentionally or maliciously – exposed the prisoners to CS gas. And accidentally deploying force is antithetical to deploying that force maliciously or sadistically." *Id.* at 937.

In another case, *Delaney v. Zmuda*, 2020 WL 3618802 (D. Kan. July 2, 2020) (unpublished), the plaintiff's cellmate, Booton, was causing a disturbance in their cell. *Id.* at *1. Booton began to engage in self-harming behavior. *See id.* Corrections Sergeant Darter responded

and sprayed pepper spray at Booton through the food pass. *Id.* Booton then failed to respond to an order to come to the cell door to be restrained, and another officer sprayed a large can of pepper spray into the cell. *Id.* The plaintiff was sitting on the top bunk inside the cell during the incident. *Id.* The plaintiff brought an Eighth Amendment excessive force claim. *Id.* at *2.

Upon screening the plaintiff's complaint, the district court concluded, "[t]he events described by Plaintiff do not demonstrate that any defendant acted with the subjective intent required to state a claim for the use of excessive force *against him.* Defendants' actions were directed at Inmate Booton, with Plaintiff being no more than an unfortunate bystander." *Id.* (emphasis in original). In all, "[t]he complaint [did] not show that Defendants maliciously, sadistically, or even intentionally exposed [Plaintiff] to pepper spray." *Id.* Accordingly, the district court dismissed the Eighth Amendment excessive force claim.

Finally, in *Simmons v. Everett*, 2008 WL 3843455 (E.D. Va. Aug. 15, 2008) (unpublished), an inmate in plaintiff's unit attacked a prison guard. *Id.* at *2. The plaintiff was not involved in the incident and was in his cell with his cell door closed and locked at the time of the attack. *Id.* When plaintiff heard the commotion, he went to his cell door to look out the window. *Id.* An officer, observing the attack, "picked up a shotgun and attempted to fire a blank warning round, but the shotgun only clicked and did not fire or make a sound." *Id.* The officer then "chambered the weapon and fired the first of rubber bullets. As the inmate continued his assault on the prison guard, [the] officer fired two additional rounds." *Id.* Some of the officer's rubber pellets ricocheted under plaintiff's cell door and hit his feet. *Id.* The plaintiff initiated an Eighth Amendment excessive force claim. *Id.* at *4.

On summary judgment, the district court concluded, "the Constitution allows prison guards to quell violence in the prison with *deadly force*, and [the] officer's use of *non-deadly* force in the

circumstances of this case was clearly justified, measured, and reasonable." *Id.* at *4 (emphasis in original). "Although any injury to an innocent bystander such as plaintiff is unfortunate, the record before the Court established that [the] officer applied a reasonable level of force in good faith effort to restore order. No evidence exists of a malicious attempt to cause harm to plaintiff or to any inmate." *Id.*

Significantly, the facts of the case at bar do not align perfectly with *Redmond*, *Delaney* and *Simmons*. In those cases, it was undisputed that the force was deployed reasonably and for an appropriate purpose against the intended target.[14] As explained above when analyzing Detainee Davis's claim, it is an unresolved question of fact whether the force utilized against Detainee Davis was objectively reasonable. *See supra*. Therefore, it follows, that it is an unresolved question of fact if the force utilized against Ewell, a bystander, was "applied in a good faith effort to maintain

[14] In *Redmond* and *Delaney* the courts focused on the fact that force was not intended for the plaintiff. *See Redmond*, 882 F.3d at 937 ("defendants inadvertently … exposed the prisoners to CS gas."); *see also Delaney*, 2020 WL 3618802, at *2 ("Defendants' actions were directed at Inmate Booton, with Plaintiff being no more than an unfortunate bystander."). Each party accepts Defendant Davis's explanation that Detainee Davis was the intended target and Ewell was a bystander. Docket No. 38 at 12 ("Sergeant Davis intended to strike Plaintiff Davis with the rubber pellets, not Ewell."); Docket No. 49 at 17 ("Seargeant Davis conceded that 'Ewell just happened to be sitting next to' Mr. Davis[.]"). However, reviewing the videos and Defendant Davis's deposition leads the Court to question this position. During his deposition, Defendant Davis testified he believed Detainee Davis was "part of the riot upstairs," was handcuffed, and brought downstairs [Docket No. 49-2 at 3-4]; Detainee Davis was "double handcuffed" [Docket No. 38-3 at 10]; and, at the moment of the shooting, Detainee Davis "started to lean up, that was him actively moving away from the ground" [Docket No. 38-3 at 12; *see also* Docket No. 49-2 at 18]. However, as noted above, Detainee Davis was downstairs during the disturbance [Docket No. 42-10 at 21:54:14-22:17:03]. Ewell was retrieved from the upstairs area and brought downstairs. *See id.* at 22:22:50-22:23:39; *see also* Docket No. 42-17 at 22:25:25-22:25:41; 22:28:03-22:28:24. Based on the rec yard video, Ewell appears to be double cuffed as his hands are nearly by his sides. *See* Docket No. 42-17 at 22:26:55. At the time Defendant Davis begins shooting, Ewell is nearly in a seated position with his knees bent. *See id.* at 22:34:40. Finally, Ewell was struck multiple times by the rubber pellets whereas Detainee Davis was struck once. *See* Docket Nos. 42-20 through 42-23. Therefore, a reasonable juror could question whether Defendant Davis's use of force against Ewell was inadvertent.

or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Smith*, 339 F.3d at 1212.[15] Accordingly, a reasonable factfinder could conclude Defendant Davis's use of force was applied maliciously and sadistically under the circumstances and, therefore, represents a violation of Ewell's Eighth Amendment rights.

**D. Clearly Established Law**

Ewell further argues his right "to be free from gratuitous force while restrained and complaint was clearly established." Docket No. 49 at 20. In contrast, Defendant Davis relies on *Redmond, Delaney, Simmons* and other cases to contend that, since his use of force against Ewell was inadvertent, he did not violate a clearly established law. Docket No. 38 at 19. However, as explained, this line of cases does not perfectly encompass the factual scenario before the Court. *See supra.*

Construing the facts in Ewell's favor, the Court agrees Defendant Davis violated clearly established law. In *Miller v. Glanz*, the Tenth Circuit held the plaintiff stated an Eighth Amendment excessive force claim when he alleged after being placed in a holding cell officers "kicked, choked, beat and stomped" on him. *Miller v. Glanz*, 948 F.2d 1562, 1567 (10th Cir. 1991). Furthermore, "the weight of authority from other courts" have found the law to be as Ewell maintains. *Panagoulakos*, 741 F.3d at 1129. Multiple circuit courts have concluded "officials may not use

---

15 The Court notes in *Redmond* the plaintiff argued "because the officers used excessive force against Hill[, the intended target,] by subduing him with CS gas, the officers also employed excessive force against all the prisoners exposed to the gas." *Redmond*, 882 F.3d at 937. The Tenth Circuit concluded, "*even assuming an excessive force claim is transferable in this way*, Redmond fails to show the officers maliciously and sadistically deployed force against Hill." *Id.* (emphasis added). Therefore, the Tenth Circuit has not foreclosed the possibility of a transferable excessive force claim. Furthermore, as explained, sister courts analyzing a bystander Eighth Amendment excessive force claim routinely consider whether the force used against the intended target was appropriate. Thus, the Court concludes, in this circumstance, linking Ewell's claim to Detainee Davis's is warranted.

gratuitous force against a prisoner who has already been subdued[.]" *Skritch v. Thornton*, 280 F.3d 1295, 1303 (11th Cir. 2002); *see also Giles v. Kearny*, 571 F.3d 318, 326 (3d Cir. 2009) ("[A]t the time of the incident in 2001, it was established that an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued."); *Cowart v. Erwin*, 837 F.3d 444, 454 (5th Cir. 2016) (noting that "courts have frequently found constitutional violations in cases where a restrained or subdued person is subjected to the use of force.").

Accordingly, accepting Ewell's version of events as the Court must do at this stage, the use of force against Ewell – a subdued prisoner laying on the ground with his hands cuffed whom Defendant Davis acknowledges was not shot due to any of his own conduct[16] – violated clearly established law. Therefore, Defendant Davis's Motion for Summary Judgment as to Ewell is denied, and he is not entitled to qualified immunity.

## CONCLUSION

Accordingly, Defendant Lino Davis's Motion for Summary Judgment [Docket No. 38] is **DENIED**.

**DATED** this 16th day of November, 2026.

GERALD L. JACKSON
United States Magistrate Judge

[16] During his deposition Defendant Davis was asked, "[a]nd it would sound like then that you're not asking a jury to look at Neville Ewell's action in support of the justification for your use of force against him, correct?" Docket No. 49-2 at 33-34. Defendant Davis responded, "[y]eah, I'm saying that the only reason I shot was because of Davis." *Id.* at 34.